# LAMPERT BROS. LUMBER COMPANY v. JAKE LAMPERT YARDS, INC. AND ANOTHER.[1]

March 22, 1929.

No. 27,074.

*Kyle & Kyle,* for appellants.

*Oppenheimer, Dickson, Hodgson, Brown & Donnelly,* for respondent.

TAYLOR, C.

About 50 years ago Leonard Lampert and Jacob Lampert, brothers, engaged in the retail lumber business at Sleepy Eye, Minnesota. A few years later they incorporated as the Lampert Lumber Company. In 1923 they concluded to separate and divide the property. They had been unusually successful, and at this time the company had 72 lumber yards in Minnesota and adjoining states and possessed assets valued at $2,500,000. For the purpose of this case

[1]Reported in 224 N. W. 248.

the brothers may be considered as owning all the stock of the company and the division as including all the property, although some of the stock was held by members of their families and by old employes, and certain items of what may be termed outside property were not included in the division. They appointed five employes who were stockholders as a committee to divide the properties into two parts of equal value. The division into two parts as made by this committee was completed in February, 1924. Leonard Lampert organized plaintiff corporation, and all the properties included in one of those parts were conveyed to that company. Jacob Lampert organized defendant Jake Lampert Yards, Incorporated, and all the properties included in the other part were conveyed to that company. Shortly thereafter differences arose between them concerning certain minor matters claimed by Jacob to have been overlooked in making the division, and concerning the allowance made in the division for losses on poor accounts and bills receivable and on farms taken in settlement of accounts. In January, 1925, they agreed to have their differences and their respective claims adjusted and determined by a committee of three, each to select one member and these two to select the third, the purpose being to equalize the losses above mentioned. The controversy is wholly between the two new companies, and as defendant Fidelity & Deposit Company seems to have taken no active part in the litigation, for brevity and convenience we shall use the term defendant as designating defendant Jake Lampert Yards.

W. H. O'Toole and J. F. Greer were partners as public accountants. O'Toole had been employed by the old company to audit its books and had also acted as accountant when the division of property was made. Greer had also done some work for the old company and had assisted both of the new companies in preparing income tax reports. Plaintiff selected O'Toole as an arbitrator, but, as he went to New York to remain for an extended and indefinite period, substituted Greer in his stead. Defendant selected L. E. Streater as an arbitrator. Streater had been employed by the old company but had left it to engage in the lumber business for him-

self, and at the time of the arbitration was operating several lumber yards of his own. He was a lumber dealer and not an accountant. Both parties agreed upon Streater and Greer as arbitrators in the early part of July, 1925, but differed concerning the matters to be submitted and the conditions of the submission. They seem to have been unwilling to discuss these matters directly with each other, and apparently by mutual consent Greer, known to both, acted as the medium of communication between them and reduced to writing the agreement at which they finally arrived. It is dated September 4, 1925. It designated Streater and Greer as arbitrators and provided that they should select the third. It provided that each party should give to the other a surety bond in the sum of $25,000 conditioned to abide by, perform, and fulfil the award. Other provisions will be referred to later. It seems to have devolved upon Greer to procure the execution and exchange of the bonds, and this was not accomplished until October. A. A. Imus, a certified public accountant suggested by Streater and found acceptable to both parties, had been selected as the third arbitrator before the execution of the written agreement.

The old company had kept separate ledgers in its general office for each of its 72 yards in which the transactions pertaining to that yard were entered from daily reports received from the yard. As these ledgers were filled new ones were opened, and there were perhaps more than 120 of these ledgers at the time of the division. Those pertaining to the yards conveyed to plaintiff were turned over to plaintiff, and those pertaining to the yards conveyed to defendant were turned over to defendant.

The agreement provided that each party should state in writing the matters and things intended to be referred to the arbitrators by that company, and should furnish a copy of such statement to the other party at least ten days before the first sitting of the arbitrators; and that only the matters and things mentioned in those statements were to be considered by the arbitrators. The arbitrators held their first meeting at Streater's office February 6, 1926, and selected Streater as chairman and Greer as secretary. They had before them the statements of both parties.

The claims set forth therein, termed losses by the parties, were in most cases claims that the lands and doubtful accounts and notes received in the division were not of the value at which they had been charged to the parties. The corrections claimed by defendant aggregated over $50,000, and those claimed by plaintiff aggregated perhaps double that amount. As a preliminary matter the arbitrators agreed upon the procedure to be followed—Greer and Imus being expert accountants were to examine and check the books and records, and the three were to consider and pass upon the facts ascertained. Greer and Imus began on defendant's claim and spent nearly a month in defendant's office examining and checking the books and records relating to the numerous items listed therein as having been overvalued at the time of the division. Defendant directed its employes in the office to give them any information or assistance they desired. On completing this examination they went to plaintiff's office and began examining and checking the books and records relating to plaintiff's claim. They discovered that the two claims were not made out on the same basis; that they were based upon a different "cutoff" date; and that plaintiff's claim included interest on the items while defendant's did not. They asked the parties to meet for the purpose of agreeing upon a common basis for the claim, but defendant refused to meet with plaintiff. They then asked defendant to amend its claim to conform to that of plaintiff, which defendant refused to do. They then asked plaintiff to amend its claim to conform to that of defendant, to which plaintiff consented, and the changes were made. .

On May 20, 1926, the arbitrators made their award in which they directed that defendant pay plaintiff the sum of $32,408.81, being the balance found due plaintiff according to schedules attached to the award. Defendant refused to pay, and plaintiff brought this action against defendant and the surety on its bond to recover the amount. The jury returned a verdict against defendant for the full amount and against the surety company for the amount of its bond. Defendants appealed from an order denying their alternative motion for judgment or a new trial.

Defendant contends that the award is invalid and asserts as grounds therefor that Greer was not impartial and was guilty of misconduct in conferring with plaintiff in reference to the preparation of plaintiff's claim; that the arbitrators were guilty of misconduct in causing or permitting plaintiff to present amended claims; that the meetings of the arbitrators were held without notice to the parties; that two of the arbitrators examined books and records and made decisions without the third participating therein; that no witnesses were sworn; and that no evidence was taken of values.

Apparently neither the parties nor the arbitrators had ever had any previous experience in arbitrations, and they had no attorneys and no legal advice. Hence it is not surprising that the proceedings were more or less irregular from a legal standpoint.

The claim that Greer was not impartial is based on two letters written by Leonard Lampert and one by O'Toole. Plaintiff originally selected O'Toole as an arbitrator. On July 3, 1925, Leonard wrote O'Toole in New York that it seemed impossible to wait for his return and suggested substituting Greer, and added:

"If you agree with us kindly make whatever suggestions you desire to make, to Mr. Greer and we will then appoint him in your stead."

He inclosed in this letter another which had been written some months earlier but had not been mailed. The inclosed letter suggested a course of procedure and a method to be followed in computing and determining gains and losses, and the manner of handling and disposing of various other matters. No reference was made to the merits of the claims of either party, and the matters suggested were to apply equally to both. We find nothing improper in this letter. O'Toole assented to the substitution of Greer and inclosed the above letter in the following letter to him:

"I am inclosing herewith copy of a communication from Lampert, which kindly peruse and digest, prior to your acting as referee. Personally I am convinced that Mr. L. Lampert is in the right. However, do not permit my judgment to influence you."

Defendant would have the court infer from these letters, and particularly from the letter of O'Toole, that Greer was not impartial. Plaintiff urges that so far as appears O'Toole knew nothing of the claims of either party, and that he referred to the suggestions in respect to procedure contained in the letter inclosed. All decisions were made and concurred in by all three arbitrators. The court instructed the jury that the arbitrators must be impartial, and that if one of them was partial to one of the parties it was ground for setting aside the award although all three joined in it. The jury by their verdict found that the arbitrators were impartial, and we think the question was for them to determine.

The claim that Greer was guilty of misconduct is based upon the fact that after the exchange of the bonds and before the first meeting of the arbitrators Greer had several interviews with plaintiff in reference to the arbitration. The testimony shows that defendant urged Greer to get plaintiff to make out and present its statement of claims, and that he had several interviews with plaintiff concerning the purpose of the arbitration and the manner of preparing this statement. He states without contradiction that nothing was said concerning the merits of the respective claims. The question was for the jury, and they found no misconduct.

The claim that the arbitrators were guilty of misconduct seems to be based on the fact that the agreement provided that the arbitrators were to consider "only those matters and things *  *  * comprehended in" the statements which were to be presented before the first meeting of the arbitrators; and that they caused or permitted plaintiff to change or amend its statement for the purpose of placing it on the same basis as that of defendant. We see nothing improper in this. Each party claimed so-called losses in specified amounts upon a multitude of particular items listed in its statement. As previously stated, the computations of defendant were upon a different basis from those of plaintiff. To determine the relation which the losses of one bore to the losses of the other, it was necessary that the losses of both be computed in the same manner and upon the same basis. Defendant, having refused to change

its claims for the purpose of placing them upon the basis adopted by plaintiff, cannot complain because the claims of plaintiff were changed for the purpose of placing them upon the basis adopted by defendant, whether this was done by plaintiff or by the arbitrators.

The remaining objections to the award may be considered together, and it may be conceded that the irregularities urged are sufficient to avoid the award unless they were waived. The agreement provided:

"The said arbitrators shall be at liberty to examine the parties either or both of them, and the witnesses in the reference, and the parties, if examined, shall be examined on oath or affirmation. The parties respectively shall, if necessary, produce before the arbitrators all books, documents, papers, maps, plans and writings in their custody, power or control relating to the matters referred, which the said arbitrators may require. The arbitrators shall be at liberty to proceed ex parte, if either of the said parties shall refuse or neglect to attend the reference without reasonable excuse for such refusal or negligence."

The arbitrators held their meetings without giving notice thereof to the parties and without the presence of the parties. This would invalidate the award unless waived. Janney, Semple & Co. v. Goehringer, 52 Minn. 428, 54 N. W. 481; Lee v. Tysdal, 163 Minn. 355, 203 N. W. 988. Neither the arbitrators nor the witnesses were sworn. This being a common law arbitration, they were not required to be sworn unless the agreement so stipulated. Holdridge v. Stowell, 39 Minn. 360, 40 N. W. 259; 5 C. J. 69 and 88. The agreement required the parties to be sworn if examined. In fact no formal hearings were held for the presentation of evidence; but the arbitrators tried to get the parties to meet for the purpose of determining the basis upon which the claims were to be computed, and later tried to get them to meet for the purpose of considering and determining the valuations to be placed on the lands taken in settlement of accounts; but in both cases defendant refused to meet with plaintiff.

The two expert accountants went over the books, records and papers of both parties in the same manner. They did not confine their work to an auditing of the books, but obtained from each party and its office employes such information as they were able to give concerning the assets claimed to have been overvalued and the amounts realized thereon and the amounts likely to be realized in the future, and also obtained the opinions of bankers and other outsiders concerning the value of various items. They could properly obtain the opinion of outsiders. 5 C. J. 74. They reported to Streater almost daily the information obtained with abstracts of the records examined, and in all cases the values were fixed by the three in conference. All three state that the claims of both parties were handled and considered in the same manner and were determined upon the same basis.

The arbitrators began their work in defendant's office, and defendant knew from the beginning the manner in which they were conducting their proceedings and how they were ascertaining the facts upon which to base their decision; and instead of objecting acquiesced therein and took part in the proceedings. Not only this but refused to meet jointly with the other party when expressly requested to do so. The facts previously mentioned and other facts not mentioned fully warranted the jury in finding that defendant by its conduct had waived all the irregularities of which it now complains. State ex rel. Grubbs v. Schulz, 142 Minn. 112, 171 N. W. 263; Larson v. Nygaard, 148 Minn. 104, 180 N. W. 1002; DuFresne v. Marine Ins. Co. Ltd. 157 Minn. 390, 196 N. W. 560; Lee v. Tysdal, 163 Minn. 355, 203 N. W. 988; 5 C. J. 101.

Defendant insists that the court erred in certain portions of the charge. The charge was full and complete and covered all matters in issue, and submitted them to the jury clearly, fairly and impartially. In the statement which defendant stresses as constituting the most important error, the court said to the jury that if plaintiff had been guilty of any such conduct with respect to one of the arbitrators

"as had a reasonable tendency to affect improperly the decision of the arbitrator or arbitrators in his decision of the matter at issue under this agreement, such, if found, would be sufficient ground for invalidating the award, *provided you found that in fact it resulted in prejudice to this defendant.*"

Defendant urges that the phrase italicized is incorrect and that a private conference between plaintiff and an arbitrator disqualified the arbitrator regardless of whether it influenced him. The language used is substantially what this court said in McQuaid M. H. Co. v. Home Ins. Co. 147 Minn. 254, 180 N. W. 97. No objection or exception was made at the time. However in another part of the charge the court told the jury:

"If you should find from the evidence in this case that any of the arbitrators were not impartial, or had private conferences with the plaintiff after their appointment with respect to the subject matter of the arbitration, or had received communications from any person influencing or tending to influence them, or any of them, then your verdict would be for the defendants, unless you find that such misconduct on the part of the arbitrators has been waived under the rules you have already heard."

This thought was impressed upon the jury repeatedly in the charge, and the charge as a whole was sufficiently favorable to defendant. In view of the manner in which the arbitration had been carried on and of the conduct of the parties, we think defendant has no substantial ground for complaining of the manner in which the case was submitted to the jury.

Order affirmed.